Louis D. Lopez, SBN 021191
Zachary H. Levy, SBN 039323
**GREENBERG TRAURIG, LLP**
2375 East Camelback Road
Suite 800
Phoenix, AZ 85016
Louis.Lopez@gtlaw.com
Zach.Levy@gtlaw.com
(602) 445-8000

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeffrey Jacobs,<br><br>                    Plaintiff,<br><br>v.<br><br>Industry Express Car Wash, LLC, a California limited liability company; Timothy Berger and Christina Berger, husband and wife; NLMGA Trust dated May 2, 2005; John Cochran and Sharon Cochran, husband and wife; JOHN DOES 1 through 10; and XYZ CORPORATIONS 1 through 10,<br><br>                    Defendants. | Case No.<br><br>**VERIFIED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Jeffrey Jacobs (Plaintiff or "Mr. Jacobs"), by and through undersigned counsel, hereby brings this civil action against Defendants Industry Express Car Wash, LLC ("Industry Express"), Timothy Berger ("Mr. Berger"), and John Cochran ("Mr. Cochran") pursuant to 28 U.S.C. §§ 1331 and 1367.

## PARTIES, JURISDICTION, AND VENUE

1.    Mr. Jacobs is an individual residing in Maricopa County, Arizona.

2.    Mr. Berger is an individual residing in Maricopa County, Arizona.

3.    Christina Berger is an individual residing in Maricopa County, Arizona.

4.    Christina Berger is the legal spouse of Mr. Berger and is named herein for the purposes of collecting a judgment, if any, against their marital estate (the "Berger

Marital Estate").

5.    At all times relevant hereto, Mr. Berger acted on behalf of and for the benefit of the Berger Marital Estate. Therefore, all allegations against Mr. Berger are also made against Christina Berger and the Berger Marital Estate.

6.    Mr. Cochran is an individual residing in Maricopa County, Arizona.

7.    Sharon Cochran is an individual residing in Maricopa County, Arizona.

8.    Sharon Cochran is the legal spouse of Mr. Cochran and is named herein for the purposes of collecting a judgment, if any, against their marital estate (the "Cochran Marital Estate").

9.    At all times relevant hereto, Mr. Cochran acted on behalf of and for the benefit of the Cochran Marital Estate. Therefore, all allegations against Mr. Cochran are also made against Sharon Cochran and the Cochran Marital Estate.

10.    The NLMGA Trust dated May 2, 2005 (the "NLMGA Trust") is an Arizona trust that owns property and conducts business in Maricopa County, Arizona.

11.    Mr. Cochran and Sharon Cochran are trustees of the NLMGA Trust.

12.    At all times relevant hereto, Mr. Cochran acted in his position as Trustee of and on behalf of the NLMGA Trust.

13.    Industry Express is a California Limited Liability Company with its principal place of business in Los Angeles County, California.

14.    "JOHN DOES 1 through 10" and "XYZ CORPORATIONS 1 through 10" are persons or entities (including legal entities unaffiliated with Defendants), whose identities are not yet known to the Plaintiff and who engaged in, or contributed to, and/or derived substantial revenue from the unlawful conduct alleged in this Complaint. Defendants have not yet produced substantive information in discovery concerning their relationships with persons and entities involved in unlawful conduct. Plaintiff will assert claims against such persons or entities when they become known.

15.    The Court has federal question jurisdiction over Mr. Jacobs's claims brought pursuant to 28 U.S.C. §§ 1338, 1331, 2201, and 2202 because those claims arise

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

under the laws of the United States.

16.    The Court has supplemental jurisdiction over the claims brought under state law pursuant to 28 U.S.C. §1367(a) because they are part of the same case or controversy as the claim brought under the laws of the United States.

17.    This court has personal jurisdiction over Mr. Berger because Mr. Berger is a resident of Arizona.

18.    This court has personal jurisdiction over Christina Berger because Christina Berger is a resident of Arizona.

19.    This court has personal jurisdiction over Mr. Cochran because Mr. Cochran is a resident of Arizona.

20.    This court has personal jurisdiction over Sharon Cochran because Sharon Cochran is a resident of Arizona.

21.    The court has personal jurisdiction over the NLMGA Trust because the NLMGA Trust is an Arizona trust with its principal place of administration in Arizona.

22.    This court has personal jurisdiction over Industry Express because Industry Express has expressly consented to submit to the personal jurisdiction of this Court.

23.    Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Maricopa County, Arizona, and Defendant Industry Express has expressly consented to venue in this District.

## **GENERAL ALLEGATIONS**

### **Mr. Jacobs, His Business Ventures, and Their Unique Marks.**

24.    Mr. Jacobs is a businessperson engaged in a variety of business activities that include, but are not limited to, agriculture, commercial real estate, consumer goods, and other business ventures.

25.    Mr. Jacobs's primary business is Southwest Specialty Food, Inc. ("Southwest Specialty"), which has manufactured and sold to distributors and directly to consumers various high gourmet food products since 1986.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

26.    Southwest Specialty focuses on infusing jalapeno, habanero, ghost chili, and other spicy peppers into hot sauce, salsa, barbeque sauce, popcorn, chips, pretzels, peanuts, and snack products.

27.    Southwest Specialty operates a store in Goodyear, Arizona and sells products abroad under the brand name "Ass Kickin."

28.    Southwest Specialty's "special sauce" is the use of a talented in-house graphics art team that develops unique "brands" and "marks" such as "Ass Kickin," "Spontaneous Combustion," "Whoop Ass," and "Salsa from Hell" to make its products standout in the marketplace.

29.    Southwest Specialty also designs and sells gift cards, apparel, and other non-food gift items utilizing its distinct brands and marks.

30.    Below are examples of Southwest Specialty's unique marks:



31.    Southwest Specialty's graphics team also develops personal customer branding using its unique style for marketing or gifts. Below are examples of that personal branding:



32.     Southwest Specialty's over the top "cartoonish" humorous bright colorful marks are intended to make the product stand out from the competition.

33.     The over the top "cartoonish" humorous colorful marks are unique to the company, not otherwise used in the marketplace, and specific to the company.

34.     There is a large marketplace for high demand unique designs like the designs created by Southwest Specialty.

35.     Companies are looking for ways to make their products standout from the competition.

36.     Southwest Specialty's products compete in a crowded marketplace with similar products.

37.     Standing out in a crowded marketplace is mission critical to product success.

38.     Southwest Specialty spends thousands of hours designing, revising, and testing different variations of a mark to find the right color scheme, phrase, graphic, and presentation to make it "pop" to drive the consumer to the product.

39.     Southwest Specialty goes through different failed marks before it finds the right mark that resonates with the customer to drive sales.

40.     Finding the right color scheme and the right branding phrase is a labor-intensive process that relies on individual talent, skill, creativity, and humor that cannot be replicated.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

41.    Southwest Specialty's design process not only considers how the mark will appear on physical paper, labeling, boxing, etc., but how it will appear on a social media platform.

42.    This is where Southwest Specialty's expertise, intellectual property, creativity, and hard work comes into play.

43.    Many marks succeed on a social media platform, but do not succeed on a physical marketing platform.

44.    Or, many marks succeed on a physical marketing platform, but fail on a social media platform. Southwest Specialty's branding is designed to excel on all marketing platforms.

45.    It catches the eye of a customer whether the product sits on an airport shelf at Phoenix Airport or appears while the customer scrolls through social media platforms.

46.    Southwest Specialty's unique process cannot be duplicated, is unknown to the general public, and cannot be reversed engineered as it is based upon its own internal customer data gathered through trial and error.

47.    Every failure helps Southwest Specialty revise a mark to find the right combination of colors, graphics, and humor to resonate with the customer.

48.    An individual that misappropriates its branding receives an incredible economic and competitive advantage as it avoids the substantial expense Southwest Specialty incurs developing its unique branding.

49.    The commercial use of Southwest Specialty's marks without authorization immediately and irreparably dilutes the value of its unique style within the marketplace.

50.    A design has less value when it is already used in commerce by another business or when another person misappropriates a mark's unique style to promote its product.

51.    This harm is magnified by social media marketing programs in which a misappropriated brand is widely disseminated on the internet, TikTok, Instagram, X, LinkedIn, and other social media platforms permanently.

703692964

52.   Once the brand is associated with a particular company or product it is impossible to dissociate the brand from the product on social media marketing platforms or the internet.

53.   The diminution of a misappropriated mark disseminated on the internet or on social media platforms is impossible to quantify with reasonable certainty because copies of the mark cannot be permanently removed, which is why Southwest Specialty protects its developed marks with diligence.

54.   Consumers recognize Mr. Jacobs's distinct, outlandish marks.

55.   In Mr. Jacobs's experience, when a consumer associates his distinct branding with a product the consumer assumes the marks are used with his permission and assumes that Southwest Specialty is vouching for the product's quality.

56.   Any unauthorized user is appropriating the goodwill that Mr. Jacobs developed in the marketplace at a tremendous financial benefit to it and without compensation to Mr. Jacobs or Southwest Specialty.

57.   When the product that the unauthorized user sells is inferior, poorly produced, fails to meet consumer expectations, or is not commensurate with the level of customer service associated with Southwest Specialty's products, Southwest Specialty's business reputation and goodwill are negatively impacted, which negatively impacts sales.

58.   Maintaining a strong business reputation when product reviews are disseminated on the internet and the reviews can never be taken down is critical to the successful e-commerce platform Southwest Special maintains for its products.

59.   Negative customer feedback can have a profound impact on business reputation. Customer dissatisfaction can quickly spread through social media, forever tarnishing the business's image.

60.   This can lead to existing and potential customers being turned away as they often check reviews before making a purchase.

61.    Continuous feedback can signal unresolved issues, making the business

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

appear unreliable, which can lead to lost customer trust, lower sales prices, and diminished position in the market.

62.     Again, it is impossible to dissociate the consumer's poor experience with a product that is being marketed using Southwest Specialty's branding without authorization from its high-quality products.

63.     Preventing the unauthorized use of the marks that Southwest Specialty develops is critical to maintaining a strong business reputation and goodwill.

### Industry Express Car Wash, LLC.

64.     Industry Express Car Wash LLC (the "Company") is a manager-managed California limited liability company, incorporated on or about September 23, 2019.

65.     The Company was formed to own, manage, and operate an express car was in City of Industry, California.

66.     The car wash does business as "Super Duper Car Wash."

67.     Industry Express has four members: the Berger Marital Estate, Mr. Jacobs's marital estate with his wife Linda Jacobs, Alec Berger, and the NLMGA Trust.

68.     Mr. Jacobs and his wife have a 35.05% interest in the Company, the Berger Marital Estate has a 40.05% interest in the Company, the NLMGA Trust has a 19.9% interest in the Company, and Alec Berger has a 5.0% interest in the Company.

69.     Prior to November 1, 2024, Mr. Jacobs and Mr. Berger were the two Managers of the Company.

70.      Pursuant to a November 1, 2024 resolution approved by a majority of the Company's members (as defined in the Company's operating agreement), John Cochran was added as an additional manager of the Company.

71.     Mr. Cochran was added by Mr. Berger and Mr. Cochran (as Trustee of the NLMGA Trust) voting their interests in the Company to add Mr. Cochran as a manager.

72.     Mr. Jacobs is not an employee of the Company.

73.     Mr. Jacobs does not receive a salary from the Company.

74.     Mr. Jacobs does not have an employment contract with the Company.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

75.    The Company does not issue Mr. Jacobs a W-2 or 1099.

76.    The Company does not provide Mr. Jacobs with any employment benefits.

77.    Mr. Jacobs has not received any compensation from the Company in any form.

78.    Mr. Jacobs is not required to devote any amount of time to the Company.

79.    Mr. Jacobs is not required to take any specific activity on behalf of the Company.

80.    Mr. Berger and the Company's other members knew at the time Mr. Jacobs assumed the role as a manager of the Company that he was actively engaged in other business activities, including those related to Southwest Specialty.

81.    The Company is controlled by an operating agreement (the "Operating Agreement"). A true and correct, unsigned copy of the Operating Agreement is attached as Exhibit A.

82.    Mr. Berger represents that Mr. Berger, Mr. Jacobs, Alec Berger, and Mr. Cochran (on behalf of the NLMGA Trust) have executed a copy of the Operating Agreement. Mr. Jacobs does not have that executed copy in his possession, custody, or control.

83.    Section 1.4 of the Operating Agreement states, "[t]he purpose of the Company is to pursue the activities selected by the Members." The selected purpose of the members is to operate an express car wash.

84.    Section 4.9 of the Operating Agreement states, "A Manager shall not be required to manage the Company as the Manager's sole and exclusive function. A Manager may have other business interests and may engage in other activities in addition to those, relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in any other investments or activities of the Manager or to the income or proceeds derived therefrom."

85.    Section 6.9 of the Operating Agreement states, "Except as contemplated hereby or required by a court of competent authority, each Member shall keep

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

confidential and shall not disclose to others and shall use its reasonable efforts to prevent its affiliates and any of its, or its affiliates', present or former employees, agents, and representatives from disclosing to others without the prior written consent of the Management Committee any information that (i) pertains to this Agreement, any negotiations pertaining thereto, any of the transactions contemplated hereby, or the business of the Company, or (ii) pertains to confidential or proprietary information of any Member or the Company or that any Member has labeled in writing as confidential or proprietary. No Member shall use, and each Member shall use its best efforts to prevent any affiliate of such Member from using, any information which (i) pertains to this Agreement, any negotiations pertaining hereto, any of the transactions contemplated hereby, or the business of the Company, or (ii) pertains to the confidential or proprietary information of any Member or the Company or that any Member has labeled in writing as confidential or proprietary, except in connection with the transactions contemplated hereby. The term "*confidential information*" is used herein to describe information that is confidential, non-public or proprietary in nature, was provided to the Member or its representatives by the Company, any other Member, or such Persons' agents, representatives and employees, and relates either directly, or indirectly to the Company or its business. Information that (i) is available, or becomes available, to the public through no fault or action by the Member, its agents, representatives or employees or (ii) becomes available on non-confidential basis from any source other than the Company, any other Member, or such Persons' agents, representatives or employees and such source is not prohibited from disclosing such information, shall not be deemed confidential information."

86.    Section 6.10 of the Operating Agreement states, "Except as otherwise provided by applicable law, any Member may, but shall not be obligated to, lend money to the Company, act as surety for the Company *and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a person or entity who is not a Member*. A Member, any affiliate thereof or

an employee, stockholder, agent, director or officer of a Member or any affiliate thereof, may also be an employee or be retained as an agent of the Company. The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member." (Emphasis added.)

87. Section 11.12 of the Operating Agreement states, "Notwithstanding anything in this Article to the contrary, the parties shall have the right to seek temporary restraining orders, preliminary injunctions, and similar provisional, equitable relief in a court of competent jurisdiction if there is a material breach of this Agreement, and if the party seeking such equitable relief has determined in good faith that the circumstances of the breach require immediate relief."

88. Section 11.13 of the Operating Agreement states, "In any dispute between any Member and the Company or between any Members concerning the Company, whether in arbitration or litigation, the prevailing party shall be entitled to recover all reasonable costs incurred and the losing party shall pay all such reasonable costs, including attorney's fees, mediation costs, arbitration costs, court costs, appraisal costs, and the cost for all expert witnesses."

89. Section 12.9 of the Operating Agreement states, "This Agreement constitutes the entire statement of the Members relating to the Company and supersedes all prior statements, contracts or agreements with respect to the subject matter of this Agreement, whether written or oral."

**Mr. Jacobs Creates and Registers the Super Duper Marks.**

90. Prior to Mr. Jacobs becoming a member or manager of the Company, Mr. Berger approached him about investing in the Company. The Company had a preexisting operating agreement in place. A true and correct copy of that operating agreement is attached as Exhibit B. Mr. Berger was the sole manager and member of the Company at the time.

91. Mr. Jacobs became acquainted with Mr. Berger through the Phoenix-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

11

Goodyear Airport.

92.    Mr. Berger operates the fixed-base operator at the airport and Mr. Jacobs is a longtime patron of the airport.

93.    Mr. Berger was aware of Mr. Jacobs's 40+ years of design and branding expertise and particular skill with creating unique, recognizable branding materials for his companies.

94.    When Mr. Jacobs approached Mr. Berger about investing in the Company, Mr. Berger intended to utilize the same branding/color scheme he employed at a car wash he owned in Tustin, California, Go Green Express.

95.    Mr. Berger developed a mark for Go Green Express that was a dull blue, green, and yellow color scheme that did not standout.

96.    Mr. Berger wanted to use his Go Green Express branding as branding for the Company's car wash.

97.    Mr. Jacobs told Mr. Berger that he was hesitant to invest in the Company, he was not impressed with his car wash in Tustin, specifically the color scheme, he was not impressed with Mr. Berger's marketing platform, and the Company would need a complete makeover if he was going to invest in the Company.

98.    Car washes are a "dime of dozen" and having a bright vibrant color scheme and branding is critical to making a car wash standout, no different than the food products that Mr. Jacobs promotes within the market.

99.    Mr. Jacobs's idea was to create a cartoon-like, muscular superhero character made of car-wash brushes.

100.    In September 2020, without any request from Mr. Berger, Mr. Jacobs on his own engaged Southwest Specialty's illustrator, Greg Bluvas, to develop potential car wash marks for the Company.

101.    Mr. Jacobs had worked with Mr. Bluvas for over twenty years.

102.    Mr. Jacobs provided Mr. Bluvas an initial sketch of a mark as a guidepost to base the work on.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

103.  Mr. Bluvas worked with Mr. Jacobs to develop different iterations of the mark over an approximate thirty to forty-five day period.

104.  Mr. Jacobs did not task Mr. Bluvas to develop a mark specific to the Company, but a car wash in general utilizing Southwest Specialty's cartoonish, bright color scheme.

105.  Mr. Jacobs was not a manager, member, employee, or independent contractor of the Company when this work was completed.

106.  Mr. Jacobs did not commit to invest in the Company or become a member of the Company before he began or completed creation of the mark.

107.  Mr. Jacobs had not made any investment in the Company.

108.  Mr. Jacobs did not promise to sell the marks to the Company.

109.  Mr. Jacobs did not promise to license the marks to the Company.

110.  The Company did not pay Mr. Jacobs for his work.

111.  The Company did not contract Mr. Jacobs to do the work.

112.  The Company made no commitment to Mr. Jacobs to purchase or license the mark.

113.  The Company contributed nothing to Mr. Jacobs's work, contributed no ideas or suggestions, contributed no intellectual property to the work, and contributed no funds for the work.

114.  The Company did nothing and contributed nothing. Mr. Jacobs developed the marks independent of the Company and without request or suggestion from the Company.

115.  Mr. Jacobs was a "free agent" just "rifting" as to what he wanted to do for a car wash in general and was not doing anything specifically for the Company or Mr. Berger.

116.  Mr. Jacobs made no commitment to the Company to sell or license his ideas to it.

117.  Using his own intellectual property, creativity, expertise, humor, and

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

13

knowledge, Mr. Jacobs created an original sketch that he used to work with Mr. Bluvas to create a distinct mark bearing the exact unique combination of features that define a Southwest Specialty design.

118.   The mark is a cartoon-like superhero figure made of car wash brushes and displays bold outlines and bright colors.

119.   Southwest Specialty has learned that these features attract customers and the public at large.

120.   Mr. Jacobs immediately obtained ownership of the marks without having to do anything more other than the undisputed fact that he is the original author/creator of the graphic pursuant to 17 U.S.C. § 201(a).

121.   Mr. Jacobs developed the "Super Duper Car Wash" name to replace Mr. Berger's intent to use "Go Green Express."

/ / /

/ / /

/ / /

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

14

703692964

122. Mr. Jacobs's graphics include the following:



123. Mr. Jacobs registered the marks with the U.S. Copyright Office. He listed himself as the individual author of the marks. A true and correct copy of those registrations are attached as Exhibits C, D, and E.

124. The Company had no role in creating the copyrighted marks.

125. The Company contributed no resources, intellectual creativity, or other assistance to the creation of the copyrighted marks.

126. The Company paid nothing for the copyrighted marks or Mr. Bluvas's illustrations.

127. The Company possesses no ownership interest in the marks.

128. The Company possesses no equitable claim to the marks.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

15

703692964

129.  The Company never objected to Mr. Jacobs's registrations of the marks.

130.  The Company has never attempted to unwind the registrations.

131.  Mr. Jacobs owes no duty to convey the marks to the Company.

132.  The marks were completed and owned by Mr. Jacobs in October 2020, well prior to his becoming a manager or member of the Company.

133.  Mr. Jacobs hoped that the Company would purchase or license the marks from him.

134.  He provided drafts of the marks to Mr. Berger for his review as he had not committed to invest in the Company, but hoped to sell or license the marks to the Company and wanted to ensure that the Company's sole manager and member liked the marks.

135.  He wanted some return on his work, which is why he first offered the marks for sale or license to Mr. Berger.

136.  He intended to license the marks to another car wash in the event Mr. Berger did not want to license the marks for the Company.

137.  Mr. Berger stated that he liked the marks, but made no commitment to purchase the marks.

**Mr. Jacobs Becomes A Member and Manager of the Company.**

138.  In February 2022, almost a year and a half after he created the marks, Mr. Jacobs invested into and became a member and manager of the Company.

139.  Mr. Jacobs invested over $410,000 in return for a 35.05% membership interest in the Company.

140.  Mr. Jacobs received a membership interest that is directly proportionate to that of the Mr. Berger, who invested approximately $470,000 in return for a 40.05% interest in the Company.

141.  Mr. Jacobs and Mr. Berger received proportionately greater membership interests in the Company than did the NLMGA Trust—which invested over $400,000 in return for a 19.9% membership interest in the Company—because Mr. Jacobs and Mr.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

Berger personally guaranteed the Company's \$4,700,000+ loans.

142. The Company obtained two loans prior to opening the car wash: (1) a private construction loan in excess of \$3,000,000; and (2) an SBA loan in excess of \$1,700,000.

143. Mr. Jacobs and Mr. Berger each personally guaranteed the full amounts of those loans, assuming individual responsibility for them.

144. The Company would not have secured the loans but for Mr. Jacobs's personal guarantees.

145. None of the NLMGA Trust, Mr. Cochran, or Sharon Cochran personally guaranteed the Company's loans.

146. Mr. Jacobs agreed to personally guarantee the loans on the condition that he would receive a membership interest in the Company that is proportionate to his capital investment in the Company when compared to the loan and membership interest amounts of Mr. Berger, who also personally guaranteed the loans.

147. Mr. Jacobs agreed to personally guarantee the loans on the condition that he would receive a membership interest in the Company that is proportionately greater than his capital investment in the Company when compared to the loan and membership interest amounts of the NLMGA Trust, which did not personally guarantee the loans.

148. Mr. Berger and Mr. Cochran knew that Mr. Jacobs was to receive 35.05% in the Company because of his capital contributions and personal guarantees.

149. Mr. Berger and Mr. Cochran knew that Mr. Jacobs's membership interest did not reflect anything other than Mr. Jacobs's capital contributions and personal guarantees.

150. Mr. Berger and Mr. Cochran knew that Mr. Jacobs was not required to and would not convey his copyrighted marks to the Company as part of his receiving a 35.05% membership interest.

151. Mr. Jacobs risks losing over \$5,000,000 as a result of his personal guarantees.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

152.   When Mr. Jacobs invested into and became a member and manager of the Company, Mr. Berger and Mr. Cochran knew that the Company had not copyrighted the marks.

153.   Mr. Berger and Mr. Cochran knew that the Company did not possess ownership of the marks at the time Mr. Jacobs invested in the Company.

154.   Mr. Berger and Mr. Cochran knew the Company had no license or other agreement to use the marks.

155.   Mr. Berger and Mr. Cochran knew that the marks belonged to Mr. Jacobs.

156.   The Operating Agreement, which Mr. Berger, Mr. Jacobs, and Mr. Cochran (on behalf of the NLMGA Trust) signed, includes an entireties clause stating that the document reflects the total and complete understanding between the parties.

157.   Nothing in the Operating Agreement that Mr. Jacobs signed required Mr. Jacobs to convey the marks to the Company as a capital contribution or otherwise.

158.   Neither Mr. Berger nor Mr. Cochran demanded that Mr. Jacobs convey the marks to the Company as a condition precedent to becoming a member or manager.

159.   Nothing in the Operating Agreement that Mr. Jacobs signed required that he convey the marks to the Company as a condition precedent to becoming a member or manager.

160.   Nothing in the Operating Agreement that Mr. Jacobs signed prevented him from continuing to hold ownership of the marks.

161.   Nothing in the Operating Agreement that Mr. Jacobs signed required that he make the marks available to the Company for its use.

162.   Nothing in the Operating Agreement that Mr. Jacobs signed prevents him from charging the Company a fee satisfactory to Mr. Jacobs for the Company's use of the marks.

163.   Mr. Jacobs made no representation to Mr. Berger or Mr. Cochran at the time he became a member and manager of the Company that that he would convey ownership of the marks to the Company.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

164.   Mr. Jacobs made no representation to Mr. Berger or Mr. Cochran at the time he became a member and manager of the Company that he would permit the Company to use the marks for free.

165.   The marks did not constitute any part of the consideration given by Mr. Jacobs to become a member of the Company.

166.   Mr. Jacobs made a substantial capital contribution in excess of $400,000 and personally guaranteed the Company's $4,700,000+ loans to acquire his membership interest.

167.   The Company did not designate his marks as "confidential" or "proprietary information" of the Company, as the marks belonged exclusively to Mr. Jacobs.

168.   The Company did not identify the marks as Company property or assert an interest in the marks as "confidential or proprietary" Company information in a signed writing, as it was required to do under the Operating Agreement.

169.   Nor has the Company listed the marks as a Company asset on its balance sheets.

170.   When Mr. Berger and Mr. Jacobs negotiated the Company's use of the marks Mr. Jacobs made clear to Mr. Berger that if the Company decided to adopt the marks that the Company needed to pay him for the marks either through a license or an outright purchase of the marks.

### The Company Opens the Car Wash and Misappropriates Mr. Jacobs's Marks.

171.   Super Duper Car Wash opened for business in October 2023.

172.   The Company incorporated Mr. Jacobs's marks into its branding and promotional materials.

173.   Mr. Berger and Mr. Cochran, based upon their discussions together and with Mr. Jacobs, knew that the Company needed to pay a license or some other fee for the Company's use of the marks.

174.   The Company had permission to use the marks solely because Mr. Berger

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

promised to pay Mr. Jacobs for the Company's use of the marks.

175.   In April 2024, Mr. Jacobs provided Mr. Berger with a license agreement that he paid his personal attorney to draft after Mr. Berger's promises of payment went unfulfilled.

176.   Mr. Berger, acting on behalf of the Company, refused the offer and asserted that the Company owned the marks that Mr. Jacobs had completed before becoming a member.

177.   Nothing in the Operating Agreement states that upon becoming a member Mr. Jacobs was contributing the marks to the Company or that Mr. Jacobs's admission as a member was conditioned upon conveying ownership of the marks to the Company.

178.   There is no language express or implied requiring Mr. Jacobs to transfer ownership of the marks to the Company.

179.   At that point, Mr. Jacobs objected to the Company's continued commercial use of the marks.

180.   Mr. Jacobs requested that the Company cease its infringing activities, and informed Mr. Berger and Mr. Cochran in writing of the facts underlying his request.

181.   Nevertheless, the Company continued to use the marks to market and promote the car wash without compensating Mr. Jacobs for its use of the marks.

182.   The Company today displays the marks on signage and other materials at the car wash and on its website.

183.   The Company makes money from the marks.

184.   The Company never received permission from or paid Mr. Jacobs to use the marks.

185.   Mr. Jacobs is the sole owner of the marks.

186.   The Company has no interest in them.

187.   Mr. Jacobs is not required to convey ownership of the marks to the Company.

188.   Mr. Jacobs has repeatedly demanded that the Company purchase, license,

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

or remove the marks, but the Company refuses to do so.

189.   Mr. Jacobs has suffered and will continue to suffer serious injury due to the Company's infringement of his marks.

190.   Many of these harms are irreparable.

191.   First, the Company's use of the marks without any form of payment to Mr. Jacobs deprives him of his exclusive right to earn licensing fees from others' use of the marks.

192.   Second, it unjustly deprives Mr. Jacobs of his right to reap the benefits of the substantial efforts he has expended in developing unique, distinctive branding designs that give him and his companies an incredible economic and competitive advantage.

193.   The Company's use of the marks misappropriates a competitive advantage it has not earned or paid for.

194.   It is impossible to quantify Mr. Jacobs's efforts, his 40+ years of design and branding experience—which the marks inherently subsume, or the value of the marks' combined features to Mr. Jacobs or an infringing user.

195.   Third, the Company's use of the marks on its storefront, in social media, and on its website results in a permanent association between the Company and the marks in the minds of consumers, which causes the marks to immediately and irreparably dilute in value to a potential licensee.

196.   Fourth, that irremediable association between the marks and the Company also causes consumers to mistakenly assume that Mr. Jacobs is vouching for the Company's business and services.

197.   Because the Company's services are not commensurate with the level of quality or customer service associated with Mr. Jacobs's companies and products, this negatively impacts Mr. Jacobs's personal reputation and goodwill, as well as that of his businesses.

198.   Mr. Jacobs has not given the Company permission to use the Mark and, as

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1  demonstrated by this action, does not align himself with many of the Company's actions.

2      199.  This confusion will hurt Mr. Jacobs's reputation as a business owner and

3  product creator.

4      200.  Finally, if consumers learn that the Company's use of the Mark is

5  unauthorized, they may think they can use Mr. Jacobs's other copyrighted designs

6  without permission.

7      201.  It is impossible to calculate these harms with reasonable certainty.

### Mr. Berger and Mr. Cochran "Squeeze-Out" Mr. Jacobs's Member Distribution and Management Rights.

202.  Section 6.1(b) of the Operating Agreement imposes a duty of good faith on each of the Company's members. It states that "each Member . . . shall be bound by a duty to the Company and the other Members to act in Good Faith in the Member's dealings and actions related to the Company or other Members. For purposes of this section, "Good Faith" means that an act or omission to act is to be undertaken with honesty in fact and the observance of reasonable commercial standards of fair dealing."

203.  Section 6.1(b)'s duty echoes the duty of good faith and fair dealing imposed on members of a California manager-managed limited liability company by California Corporations Code § 17704.09. Section 17704.09(d) states that "[a] member shall discharge the duties to a limited liability company and the other members under this title or under the operating agreement and exercise any rights consistent with the obligation of good faith and fair dealing." Section 17704.09(f)(2) makes clear that the duty of good faith and fair dealing is applicable to members of a manager-managed limited liability company.

204.  Mr. Berger and Mr. Cochran are displeased with Mr. Jacobs's objection to the Company's continued infringement of Mr. Jacobs's individually owned marks.

205.  They have become further disgruntled since Mr. Jacobs threatened to take legal action against the Company to enforce his rights in the copyrighted marks if the Company continued to refuse to purchase or license the marks.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

206.    Mr. Berger and Mr. Cochran conspired together to retaliate against Mr. Jacobs.

207.    Their scheme consisted of circumventing provisions in the Company's Operating Agreement that are designed to protect members' and managers' rights in order to effectively strip Mr. Jacobs of his ability to receive distributions and his authority to manage the day-to-day operations of the Company.

### Mr. Berger and Mr. Cochran Oust Mr. Jacobs from Receiving Distributions.

208.    The Company is profitable as a consequence of using Mr. Jacobs's marks and marketing strategies.

209.    The Company has not made any member distributions despite its profitability.

210.    Mr. Berger has used Company profits to repay himself, plus interest, on a loan that he made to the Company.

211.    Section 3.2 of the Operating Agreement states that "[d]istributions shall be made to the Members prorate according to their Percentage Interests from time to time as determined by the unanimous consent of the Members."

212.    In other words, if membership distributions are made, they must be made to all members at the same time in proportion their membership interest in the Company.

213.    The Operating Agreement does not permit membership distributions to certain members, while withholding distributions from other members.

214.    Mr. Berger and Mr. Cochran circumvented section 3.2 of the Operating Agreement by voting to approve payment to Mr. Berger, Mr. Cochran, and Christina Berger as "management" and "services" fees. A true and correct copy of Mr. Berger's and Mr. Cochran's resolution is attached hereto as Exhibit F.

215.    Mr. Berger and Mr. Cochran did this to allow them to take member distributions in the form of "management" and "services" fees and avoid paying membership distributions to Mr. Jacobs.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

216. Pursuant to the resolution, Mr. Berger is paid $20,000 per month, Mr. Cochran is paid $15,000 a month, and Christina Berger is paid $3,000 per month.

217. The "management" and "services" fees are paid approximately in proportion to the percentage of distributions that would have been made to them had membership distributions been made in accordance with the Operating Agreement.

218. The "management" and "services" fees mimic an approximately $60,000 per month distribution to the members, but for which Mr. Jacobs does not get the respective share he is owed under the Operating Agreement.

219. To permit Mr. Berger, Christina Berger, and Mr. Cochran to receive membership distributions without paying Mr. Jacobs his owed membership distributions, Mr. Cochran and Mr. Berger authorized the payment of management and services fees solely to themselves.

220. Nothing in the Operating Agreement permits the payment of member distributions to only some of the managers.

221. The Operating Agreement requires payment to all members if and when the members are going to be paid.

222. Nothing in the Operating Agreement permits Mr. Berger and Mr. Cochran to pay management fees to certain members in lieu of making member distributions to all members.

223. Prior to Mr. Berger's and Mr. Cochran's resolution, no manager had been compensated for his management of the Company.

224. Mr. Jacobs is still a manager of the Company, and actively fulfills his duties and obligations in that role, as discussed below.

225. Mr. Jacobs is the only manager not being paid for his management of the Company.

226. Nothing in the Operating Agreement permits the payment of management fees to some of the managers.

227. The Company does not pay its constructive member distributions to Mr.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

24

Jacobs.

228.    Because Mr. Berger and Mr. Cochran receive member distributions by way of "management" and "services" fees, the Company will never pay lawful member distributions to Mr. Jacobs.

229.    Mr. Berger's and Mr. Cochran's actions constituted a de facto amendment of the Operating Agreement without following the requirements to amend the Operating Agreement.

230.    Mr. Jacobs is at risk of losing over $5,000,000 due to his investments in the Company and personal guarantees of the Company's loans.

231.    Mr. Jacobs does not stand to receive any benefit from his investments or personal guarantees.

232.    Mr. Berger and Mr. Cochran solely intended to retaliate against Mr. Jacobs in paying themselves "management" and "services" fees in lieu of member distributions, which would have to be paid to Mr. Jacobs as well.

**Mr. Berger and Mr. Cochran Strip Mr. Jacobs of His Management Rights.**

233.    Mr. Berger and Mr. Cochran further circumvented provisions of the Operating Agreement related to the removal of managers and managers' control rights in order to retaliate against Mr. Jacobs.

234.    Section 5.1 of the Operating Agreement states "[t]he ordinary business and affairs of the Company shall be managed exclusively by the Manager(s). Each Manager . . . shall have full and complete authority, power and discretion to make any and all decisions and to do any and all things that the Manager shall deem to be reasonably required to accomplish the business and objectives of the Company."

235.    Section 5.2 of the Operating Agreement states "[w]henever there is more than one Manager, they shall: (i) jointly exercise the powers granted to the Managers herein, and (ii) shall not exercise any power granted to a Manager without the approval of a majority of the Managers.

236.    Section 5.3 of the Operating Agreement defines "Majority of the Managers"

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

25

as "the affirmative vote of a majority of the Managers, i.e., if there are three Managers, a Majority of the Managers is two."

237.    Pursuant to these sections, when Mr. Jacobs and Mr. Berger were the sole managers of the Company, they each had final say to determine how the Company's day-to-day business and objectives were to be accomplished.

238.    This requirement was a material inducement to Mr. Jacobs's investment in the Company given his personal guarantee of the Company's loans.

239.    Mr. Berger agreed that no management decision would be done without Mr. Jacobs's express approval.

240.    Mr. Jacobs demanded this unanimous consent given his personal liability for the loans he personally guaranteed.

241.    The requirement that Mr. Jacobs had to approve all management decisions ensured that Mr. Berger and the other members did not take an act that put him at risk of having to personally repay the loan monies.

242.    The requirement that Mr. Jacobs had to approve all management decisions acted as a "fail safe" against personal ruin because Mr. Berger and/or the other members could not make business decisions without his express approval.

243.    The Company had two managers to reflect the fact that two individuals— Mr. Berger and Mr. Jacobs—personally guaranteed the Company's loans.

244.    The Company's management structure was designed so that those who personally guaranteed the Company's loans would always have final say on the Company's business decisions, so long as the loans remained outstanding.

245.    To further safeguard Mr. Jacobs's position, the Operating Agreement requires unanimous written consent of all members for any amendment.

246.    Mr. Berger understood that Mr. Jacobs's control over the Company's management was a material term that Mr. Jacobs demanded as a condition to investment and as a condition to guarantee the Company's loans.

247.    Without Mr. Jacobs guaranteeing the Company's loans the Company could

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1    not get the loans needed to build the car wash.

2         248.   The lenders demanded that Mr. Jacobs guarantee the loans as a condition to

3    funding.

4         249.   Mr. Cochran did not have the financial position to guarantee the loan.

5    Accordingly, he was not added as a manager of the Company.

6         250.   Mr. Berger in fact instructed his attorney to "backdate" the operating

7    agreement to show Mr. Jacobs had acquired an ownership interest in the Company earlier

8    to induce the lenders into loaning monies to the Company.

9         251.   The Company was fully dependent on Mr. Jacobs's commitment to

10   guarantee the loan.

11        252.   Section 4.4 of the Operating Agreement states "[a] Manager may be

12   removed at any time, with or without cause, by the affirmative vote of Eighty Percent

13   (80%) of the Members."

14        253.   Given the makeup of the Company's members' percentage interests,

15   Section 4.4 in effect requires all of Mr. Jacobs's, Mr. Berger's, and Mr. Cochran's consent

16   for removal of a Manager. Mr. Berger and Mr. Cochran, with a combined 59.95%

17   percentage interest in the Company, cannot remove a manager on their own.

18        254.   An express expected benefit of the Operating Agreement included Mr.

19   Jacobs's continued control of the Company's business given that he never could be

20   removed as a manager of the Company.

21        255.   An express benefit of the Operating Agreement included that no business

22   decision would be made without Mr. Jacobs's consent.

23        256.   Section 5.2 of the Operating Agreement states "[t]he number of Managers

24   of the Company shall be fixed from time to time by the affirmative vote of a Majority of

25   the Members."

26        257.   Section 4.5 of the Operating Agreement states "[a]ny vacancy occurring for

27   any reason in the number of Managers shall be filled by the affirmative vote of a majority

28   of the Members."

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

27

258.    Section 5.3 of the Operating Agreement defines "Majority of the Members" as "the affirmative vote of Members who collectively own a majority of the Percentage Interests."

259.    Mr. Berger and Mr. Cochran knew that section 4.4 of the Operating Agreement prevented them from removing Mr. Jacobs as a manager.

260.    Mr. Berger and Mr. Cochran knew that section 5.2 of the Operating Agreement prevented Mr. Berger, as one of two managers, from exercising any managerial powers or taking any managerial actions without Mr. Jacobs's consent, including continuing to use the marks that Mr. Jacobs exclusively owned.

261.    Mr. Berger engaged the Company's attorney to draft a membership resolution without Mr. Jacobs's knowledge at a time in which he represented he wanted to resolve the dispute involving the use of the marks to add a friendly manager, Mr. Cochran.

262.    Mr. Berger and Mr. Cochran then voted their membership interests to add Mr. Cochran as a manager for the express and sole purpose to eliminate Mr. Jacobs's control over the management of the Company.

263.    Mr. Berger and Mr. Cochran voted to add Mr. Cochran as a manager of the Company to take away the control that Mr. Berger promised Mr. Jacobs as the specific inducement to convince Mr. Jacobs to personally guarantee the Company's loans.

264.    Mr. Berger and Mr. Cochran took away an express and implied benefit the Operating Agreement provided Mr. Jacobs, which was management of the Company to ensure that the members did not take any action to put Mr. Jacobs at risk of financial ruin due to his personal guarantee of the Company loans.

265.    Mr. Berger and Mr. Cochran diluted Mr. Jacobs's membership interest in the Company, which was based, in part, on his control of the Company's management decisions.

266.    Mr. Berger and Mr. Cochran increased Mr. Cochran's membership interest by giving him management power that Mr. Jacobs was forced to sign a personal guarantee

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

to acquire.

267.    Mr. Berger's and Mr. Cochran's actions constituted a de facto amendment of the Operating Agreement without following the requirements to amend the Operating Agreement.

268.    Mr. Berger and Mr. Cochran had to take this action in order for the Company to continue its improper infringement on the marks and to keep the Company operational, as without Mr. Jacobs's continued participation in the Company the Company's loans are accelerated, and the Company does not have the financial means to repay those loans.

269.    Mr. Berger and Mr. Cochran did all this through a simple email exchange without advance notice to Mr. Jacobs or providing Mr. Jacobs any way to stop the farce.

270.    On November 1, 2024, Mr. Berger and Mr. Cochran—representing a majority of the Company's members—approved a resolution that (1) increased the number of managers of the Company to three, thereby creating a manager vacancy; and (2) appointed John Cochran as a manager of the Company to fill that vacancy. (*See* Exhibit F).

271.    That resolution stripped Mr. Jacobs of all his rights as a manager of the Company under section 5.2 of the Operating Agreement because Mr. Berger and Mr. Cochran now constitute a majority of the managers.

272.    Mr. Berger and Mr. Cochran effectively removed Mr. Jacobs as a manager of the Company, despite section 4.4's 80% requirement for removal of a manager, for the purpose of retaliating against Mr. Jacobs for his desire to prevent the Company from its continued infringement of the marks.

273.    Mr. Berger's and Mr. Cochran's actions were not connected to Mr. Jacobs's conduct or activities as a manager.

274.    Mr. Jacobs competently fulfilled his role as a manager of the Company.

275.    Mr. Jacobs conducted the affairs of the Company in the best interests of the Company and its members.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

29

276.    Mr. Jacobs kept safe all Company property and only used Company property for the benefit of the Company, not his personal benefit.

277.    Mr. Jacobs ensured that the Company successfully engaged in all general business practices, including those enumerated in section 1.9 of the Operating Agreement.

278.    Mr. Jacobs fulfilled all his obligations and duties as a manager of the Company.

279.    Mr. Jacobs never committed any acts of negligence, fraud, gross negligence, or willful misconduct when performing his obligations as manager.

280.    Mr. Jacobs has never been criticized by the Company's members or managers for his management of the Company.

281.    Mr. Jacobs has only been criticized by the Company's members and managers for his refusal to convey the copyrighted marks to the Company.

282.    Mr. Jacobs never received any compensation for acting as a manager of the Company.

283.    Mr. Berger and Mr. Cochran solely intended to retaliate against Mr. Jacobs in stripping him of his management rights.

## FIRST CAUSE OF ACTION
**(Copyright Infringement in Violation of the Copyright Act, 17 U.S.C. § 501)**
(*Defendant Industry Express Car Wash, LLC*)

284.    Plaintiff incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully alleged here.

285.    Mr. Jacobs is the lawful, individual owner of three, registered marks.

286.    Mr. Jacobs enjoys exclusive rights with respect to the marks, including the exclusive right to copy, reproduce, display, and create derivative works based on the same.

287.    The Company has and continues to copy, reproduce, distribute, and/or publicly display infringing copies of the marks without Mr. Jacobs's consent or authorization, in violation of 17 U.S.C. § 106. The Company's infringing copies exactly

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

replicate Mr. Jacobs's marks, without alteration.

288.    The Company has not purchased, licensed, or provided Mr. Jacobs with any other form of compensation for the marks.

289.    Mr. Jacobs has repeatedly demanded that the Company cease its infringing activities.

290.    On information and belief, the Company's infringement of Mr. Jacobs's copyrights in the marks is deliberate, willful, and in utter disregard of Mr. Jacobs's rights.

291.    As a direct and proximate result of the Company's infringement of Mr. Jacobs's copyrights, Mr. Jacobs is entitled to damages in an amount to be determined at trial, which is not currently ascertainable.

292.    Alternatively, at his election, Mr. Jacobs is entitled to the maximum allowable amount of statutory damages in the amount of $150,000 with respect to each work infringed, or for such other amounts as may be proper under 17 U.S.C. § 504(c).

293.    Mr. Jacobs is entitled to an order impounding or destroying any and all infringing materials pursuant to 17 U.S.C. § 503.

294.    Pursuant to 17 U.S.C. § 502, Mr. Jacobs is entitled to both a preliminary and permanent injunction enjoining and prohibiting Industry Express and its officers, directors, employees, agents, affiliates, successors, assigns, licensees, and entities owned or controlled by Industry Express, and those in privity or acting in concert with them, from reproducing, distributing, displaying, or otherwise using Mr. Jacobs's copyrighted marks or any other designs that are substantially similar thereto or derivative thereof.

295.    Mr. Jacobs is further entitled to his attorneys' fees and costs pursuant to 17 U.S.C. § 505.

296.    Mr. Jacobs is entitled to reasonable attorneys' fees, costs, and expenses pursuant to section 11.13 of Industry Express's Operating Agreement, Cal. Code. Civ. P. § 1032, and other applicable law.

297.    Mr. Jacobs is entitled to prejudgment and post-judgment interest.

298.    The Company's actions have caused and—unless enjoined by this Court—

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

will continue to cause irreparable injury to Mr. Jacobs for which Mr. Jacobs has no adequate remedy at law. Mr. Jacobs is therefore entitled to preliminary and permanent injunctive relief enjoining and restraining the Company from reproducing, distributing, displaying, or otherwise using Mr. Jacobs's copyrighted marks or any other designs that are substantially similar thereto or derivative thereof.

## SECOND CAUSE OF ACTION
### (Declaratory Relief)
(*All Defendants*)

299.  Plaintiff incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully alleged here.

300.  As discussed above, Industry Express is engaged in the direct infringement of Mr. Jacobs's copyrights in the marks.

301.  Pursuant to 28 U.S.C. § 2201, Mr. Jacobs is entitled to a declaratory judgment declaring that he alone owns the marks in dispute, he owes no obligation to convey the marks to the Company, he owes no obligation to allow the Company to use the marks, he has not breached the express or implied terms of the Operating Agreement, and he has not breached any fiduciary duties owed to the Company by not conveying the marks to the Company.

302.  Pursuant to 28 U.S.C. § 2201, Mr. Jacobs is entitled to declaratory relief that Mr. Berger's and Mr. Cochran's appointment of Mr. Cochran as a manager of the Company and payment of management fees to Mr. Berger, Mr. Cochran, and Christina Berger is a breach of the Operating Agreement.

303.  Pursuant to 28 U.S.C. § 2201, Mr. Jacobs is entitled to a declaratory judgment that Industry Express is infringing, has infringed, and is liable for directly infringing the copyrighted marks owned by Mr. Jacobs.

304.  Pursuant to 28 U.S.C. § 2202, Mr. Jacobs is entitled to any further relief this Court might deem necessary or proper, including preliminary and permanent injunctive relief prohibiting Industry Express (or others in privity with it or acting on its

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

behalf) from reproducing, distributing, displaying, or otherwise using Mr. Jacobs's copyrighted marks or any other designs that are substantially similar thereto or derivative thereof.

305.  Mr. Jacobs is entitled to reasonable attorneys' fees, costs, and expenses pursuant to section 11.13 of Industry Express's Operating Agreement, Cal. Code. Civ. P. § 1032, 28 U.S.C. § 2202, and other applicable law.

### THIRD CAUSE OF ACTION
### (Contributory Copyright Infringement)
(*Defendants Timothy Berger, John Cochran, and the NLMGA Trust dated May 2, 2005*)

306.  Plaintiff incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully alleged here.

307.  As discussed above, Industry Express is engaged in the direct infringement of Mr. Jacobs's copyrights in the marks.

308.  Mr. Berger, Mr. Cochran, and the NLMGA Trust (acting through Mr. Cochran, its Trustee) had actual knowledge of Industry Express's infringement.

309.  Mr. Berger and Mr. Cochran knew that the Company had not copyrighted the marks, that the Company had no ownership interest in the marks, and that the Company had no legal or equitable rights to own or use the marks.

310.  Mr. Berger and Mr. Cochran knew that the Company had not compensated Mr. Jacobs for its use of the marks.

311.  Mr. Berger and Mr. Cochran knew that Mr. Jacobs registered the marks in his individual name, and that he was the lawful sole owner of the copyrighted marks.

312.  Despite this knowledge, Mr. Berger and Mr. Cochran materially contributed to Industry Express's infringement of the marks.

313.  Mr. Berger refused Mr. Jacobs's offer to allow the Company to purchase or license the marks, and directly caused the Company to continue to copy, reproduce, display, and otherwise use the marks in the Company's advertising and other materials.

314.  When Mr. Cochran became a manager of the Company, he joined Mr.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

Berger in those actions.

315. Acting as a majority of the Company's managers, Mr. Berger and Mr. Cochran continue to actively assist Industry Express's infringement by directing the infringing activities and making all decisions necessary for the infringing activities to continue.

316. Mr. Berger and Mr. Cochran have refused all of Mr. Jacobs's offers to permit the Company to purchase or license the marks and have retained legal counsel on behalf of the Company in an effort to aid the Company in defending its blatant infringement of Mr. Jacobs's copyrights.

317. As a direct and proximate result of Mr. Berger, Mr. Cochran, and the NLMGA Trust knowingly and materially contributing to the Company's infringement of Mr. Jacobs's copyrights, Mr. Jacobs has suffered actual damages in an amount to be determined at trial, which is not currently ascertainable.

318. Mr. Jacobs is entitled to reasonable attorneys' fees, costs, and expenses pursuant to section 11.13 of Industry Express's Operating Agreement, Cal. Code. Civ. P. § 1032, and other applicable law.

319. Mr. Jacobs is entitled to prejudgment and post-judgment interest.

## FOURTH CAUSE OF ACTION
### (Breach of Duty of Good Faith and Fair Dealing in Violation of Cal. Corp. Code § 17704.09)
(*Defendants Timothy Berger and the NLMGA Trust dated May 2, 2005*)

320. Plaintiff incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully alleged here.

321. At all relevant times, Mr. Berger and the NLMGA Trust have been considered members of the Company, as defined by Cal. Corp. Code § 17701.02.

322. As members of the Company, Mr. Berger and the NLMGA Trust owed a duty of good faith and fair dealing to the Company and to Mr. Jacobs—another member of the Company—pursuant to section 6.1(b) of the Company's Operating Agreement and Cal. Corp. Code § 17704.09.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

323. This duty of good faith and fair dealing included a duty to observe reasonable commercial standards of fair dealing, which includes but is not limited to, not deliberately undermining the interests of the Company or its other members, not engaging in deceptive or dishonest conduct, not abusing one's powers, not making decisions solely aimed at harming or disadvantaging other members, and not engaging in oppressive or discriminatory conduct that unfairly harms the Company or its other members.

324. Mr. Berger and the NLMGA Trust (acting at all times through its Trustee, Mr. Cochran) breached their duties to Mr. Jacobs by devising and acting upon a scheme intended to circumvent the Company's Operating Agreement and strip Mr. Jacobs of his rights to receive distributions and manage the day-to-day business and operations of the Company.

325. Specifically, Mr. Berger and Mr. Cochran approved a resolution to pay themselves "management" and "services" fees in lieu of making member distributions to all members, including Mr. Jacobs.

326. They also diluted Mr. Jacobs's rights by appointing Mr. Cochran as an additional manager of the Company, thereby rendering Mr. Berger and Mr. Cochran collectively a majority of the company's managers.

327. Mr. Berger and Mr. Cochran took these acts in an effort to retaliate against Mr. Jacobs for his desire to enforce his legal rights in his copyrighted marks and with the goal of thereafter taking actions contrary to the interests of the Company and Mr. Jacobs.

328. As a direct and proximate result of Mr. Berger's and the NLMGA Trust's breaches, Mr. Jacobs suffered and continues to suffer great damage including complete loss of his right to distributions, complete loss of his management rights, harm to his goodwill and reputation, monetary losses incurred in pursuing his legal rights in the copyrighted works, and other harms in an amount to be determined at trial.

329. Mr. Jacobs is entitled to reasonable attorneys' fees, costs, and expenses

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

pursuant to section 11.13 of Industry Express's Operating Agreement, Cal. Code. Civ. P. § 1032, and other applicable law.

330.  Mr. Jacobs is entitled to prejudgment and post judgment interest.

### FIFTH CAUSE OF ACTION
**(Breach of Contract)**

(*Defendants Timothy Berger and the NLMGA Trust dated May 2, 2005*)

331.  Plaintiff incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully alleged here.

332.  Mr. Jacobs, Mr. Berger, and the NLMGA Trust are parties to the Company's Operating Agreement, which is a valid and binding contract.

333.  As members of the Company, Mr. Berger and the NLMGA Trust owed a duty of good faith and fair dealing to the Company and to Mr. Jacobs—another member of the Company—pursuant to section 6.1(b) of the Company's Operating Agreement.

334.  The same facts that support Mr. Jacobs's claim for breach of the duty of good faith and fair dealing in violation of Cal. Corp. Code § 17704.09 also support a claim for breach of section 6.1(b) of the Operating Agreement.

335.  Specifically, Mr. Berger's and the NLMGA Trust's contractual duty required them to observe reasonable commercial standards of fair dealing, which includes but is not limited to, not deliberately undermining the interests of the Company or its other members, not engaging in deceptive or dishonest conduct, not abusing one's powers, not making decisions solely aimed at harming or disadvantaging other members, and not engaging in oppressive or discriminatory conduct that unfairly harms the Company or its other members.

336.  As alleged above, Mr. Berger and Mr. Cochran approved a resolution to pay themselves "management" and "services" fees in lieu of making member distributions to all members, including Mr. Jacobs.

337.  They also diluted Mr. Jacobs's rights by appointing Mr. Cochran as an additional manager of the Company, thereby rendering Mr. Berger and Mr. Cochran

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

collectively a majority of the company's managers.

338.    Mr. Berger and Mr. Cochran took these acts in an effort to retaliate against Mr. Jacobs for his desire to enforce his legal rights in his copyrighted marks and with the goal of thereafter taking actions contrary to the interests of the Company and Mr. Jacobs.

339.    Mr. Berger's and Mr. Cochran's actions also constitute breaches of sections 3.2 and 4.4 of the Company's Operating Agreement.

340.    Those sections required that (1) if and when member distributions are made, they must be paid to all members in proportion their membership interests in the Company; and (2) an 80% vote of the members is required to remove a manager.

341.    Mr. Berger and Mr. Cochran (acting on behalf of the NLMGA Trust) breached those provisions by (1) circumventing section 3.2 to effectuate member distributions through "management" and "services" fees without unanimous member consent and without paying those "distributions" to Mr. Jacobs, as required; and (2) circumventing section 4.4 to effectively remove Mr. Jacobs as a manager by adding Mr. Cochran as a manager and conspiring and acting to prohibit Mr. Jacobs from meaningfully exercising his management rights.

342.    As a direct and proximate result of Mr. Berger's and the NLMGA Trust's breaches, Mr. Jacobs suffered and continues to suffer great damage including complete loss of his right to distributions, complete loss of his management rights, harm to his goodwill and reputation, monetary losses incurred in pursuing his legal rights in the copyrighted works, and other harms in an amount to be determined at trial.

343.    Mr. Jacobs is entitled to reasonable attorneys' fees, costs, and expenses pursuant to section 11.13 of Industry Express's Operating Agreement, Cal. Code. Civ. P. §§ 1032 and 1717, and other applicable law.

344.    Mr. Jacobs is entitled to prejudgment and post-judgment interest.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

## SIXTH CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
(*Defendants Timothy Berger and the NLMGA Trust dated May 2, 2005*)

345.  Plaintiff incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully alleged here.

346.  Mr. Jacobs, Mr. Berger, and the NLMGA Trust are parties to the Company's Operating Agreement, which is a valid and binding contract.

347.   In every contract or agreement there is an implied promise of good faith and fair dealing.

348.  This implied promise includes a promise that each party will not do anything to unfairly interfere with the rights of any other party to receive the benefits of the contract, and a promise that each party will be faithful to its duties or obligations under the contract.

349.  Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another.

350.  Mr. Berger and the NLMGA Trust (through the actions of Mr. Cochran, its Trustee), breached the implied covenant of good faith and fair dealing by interfering with Mr. Jacobs's rights to receive the benefits of the Operating Agreement and taking advantage of Mr. Jacobs in order to retaliate against him for seeking to enforce his legal rights in the copyrighted marks.

351.  Specifically, Mr. Jacobs has the right to receive member distributions on equal terms with all other members, and the right to meaningfully exercise his rights as a manager of the Company, unless removed as a manager by vote of 80% of the Company's membership interests.

352.  Mr. Berger and Mr. Cochran unfairly interfered with those rights and took advantage of Mr. Jacobs by: (1) effectuating member distributions through "management" and "services" fees without unanimous member consent and without paying those "distributions" to Mr. Jacobs; and (2) effectively removing Mr. Jacobs as a manager by adding Mr. Cochran as a manager and conspiring and acting to prohibit Mr.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

Jacobs from meaningfully exercising his management rights.

353.   As a direct and proximate result of Mr. Berger's and the NLMGA Trust's breaches, Mr. Jacobs suffered and continues to suffer great damage including complete loss of his right to distributions, complete loss of his management rights, harm to his goodwill and reputation, monetary losses incurred in pursuing his legal rights in the copyrighted works, and other harms in an amount to be determined at trial.

354.   Mr. Jacobs is entitled to reasonable attorneys' fees, costs, and expenses pursuant to section 11.13 of Industry Express's Operating Agreement, Cal. Code. Civ. P. §§ 1032 and 1717, and other applicable law.

355.   Mr. Jacobs is entitled to prejudgment and post-judgment interest.

### SEVENTH CAUSE OF ACTION
#### (Civil Conspiracy)
(*Defendants Timothy Berger, John Cochran, and the NLMGA Trust dated May 2, 2005*)

356.   Plaintiff incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully alleged here.

357.   As discussed above, Mr. Berger, the NLMGA Trust, and Mr. Cochran conspired to commit wrongful acts designed to strip Mr. Jacobs of his rights to receive distributions and meaningfully manage the Company.

358.   Specifically, Mr. Berger, the NLMGA Trust, and Mr. Cochran conspired to pass a Company resolution that would (1) circumvent section 3.2 of the Operating Agreement to effectuate member distributions through "management" and "services" fees without unanimous member consent and without paying those "distributions" to Mr. Jacobs, as required; and (2) circumvent section 4.4 of the Operating Agreement to effectively remove Mr. Jacobs as a manager by adding Mr. Cochran as a manager and conspiring and acting to prohibit Mr. Jacobs from meaningfully exercising his management rights.

359.   Mr. Berger, the NLMGA Trust, and Mr. Cochran knew of their agreement to commit those wrongful acts and the agreement's unlawful purpose—to retaliate against Mr. Jacobs for his desire to take legal actions against the Company to enforce his

rights in his copyrighted works.

360.   Mr. Berger, the NLMGA Trust, and Mr. Cochran intended that the wrongful acts be accomplished, agreed to cooperate in the commission of those wrongful acts, and did in fact cooperate in the commission of those wrongful acts.

361.   As a direct and proximate result of this conspiracy and the wrongful acts that resulted from it, Mr. Jacobs suffered and continues to suffer great damage including complete loss of his right to distributions, complete loss of his management rights, harm to his goodwill and reputation, monetary losses incurred in pursuing his legal rights in the copyrighted works, and other harms in an amount to be determined at trial.

362.   Mr. Jacobs is entitled to reasonable attorneys' fees, costs, and expenses pursuant to section 11.13 of Industry Express's Operating Agreement, Cal. Code. Civ. P. § 1032, and other applicable law.

363.   Mr. Jacobs is entitled to prejudgment and post-judgment interest.

### EIGHTH CAUSE OF ACTION
**(Aiding and Abetting)**
*(Defendant John Cochran)*

364.   Plaintiff incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully alleged here.

365.   As members of the Company, Mr. Berger and the NLMGA Trust owed a duty of good faith and fair dealing to the Company and to Mr. Jacobs, pursuant to section 6.1(b) of the Company's Operating Agreement and Cal. Corp. Code § 17704.09.

366.   Mr. Cochran, as Trustee of the NLMGA Trust, knew that Mr. Berger and the NLMGA Trust owed those fiduciary duties.

367.   As discussed above, Mr. Berger and the NLMGA Trust breached those fiduciary duties.

368.   Mr. Cochran substantially assisted and encouraged Mr. Berger and the NLMGA Trust to breach their fiduciary duties owed to the Company and Mr. Jacobs.

369.   Specifically, Mr. Cochran actively participated in, and in fact voted on

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

behalf of the NLMGA Trust in, the decision to approve the (1) "membership" and "services" fees payments to Mr. Berger, Mr. Cochran, and Christina Berger; and (2) addition of Mr. Cochran as a manager of the Company.

370.   Mr. Cochran knew that Mr. Berger's and the NLMGA Trust's resolution was contrary to their fiduciary duties of good faith and fair dealing in that it unfairly interfered with Mr. Jacobs's member distributions and management rights, constituted an abuse of power, and served to oppress and harm Mr. Jacobs.

371.   Mr. Cochran knew that the resolution was designed to retaliate against Mr. Jacobs for his efforts to enforce his rights in his copyrighted marks.

372.   Without Mr. Cochran's participation in that decision, Mr. Berger and the NLMGA Trust would not have been able to pass the resolution constituting a breach of their fiduciary duties.

373.   As a direct and proximate result of Mr. Cochran's aiding and abetting, Mr. Jacobs suffered and continues to suffer great damage including complete loss of his right to distributions, complete loss of his management rights, harm to his goodwill and reputation, monetary losses incurred in pursuing his legal rights in the copyrighted works, and other harms in an amount to be determined at trial.

374.   Mr. Jacobs is entitled to reasonable attorneys' fees, costs, and expenses pursuant to section 11.13 of Industry Express's Operating Agreement, Cal. Code. Civ. P. §§ 1032 and 1717, and other applicable law.

375.   Mr. Jacobs is entitled to prejudgment and post-judgment interest.

### NINTH CAUSE OF ACTION
**(Tortious Interference with Contractual Relationship)**
(*Defendant John Cochran*)

376.   Plaintiff incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully alleged here.

377.   Mr. Jacobs, Mr. Berger, and the NLMGA Trust are parties to the Company's Operating Agreement, which is a valid and binding contract.

378.   Mr. Cochran, as Trustee of the NLMGA Trust, knew of the existence and

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

terms of the Operating Agreement.

379.   As discussed, Mr. Cochran engaged in conduct that prevented lawful performance of the contract, directly caused Mr. Berger and the NLMGA Trust to breach their contractual promises, and directly caused Mr. Jacobs to not receive the benefits he was entitled to under the contract.

380.   Specifically, Mr. Cochran actively participated in Mr. Berger's and the NLMGA Trust's breach of sections 6.1(b), 3.2, and 4.4 of the Company's Operating Agreement by voting on behalf of the NLMGA Trust to effectively prohibit Mr. Jacobs from receiving distributions or meaningfully exercising his management rights.

381.   Mr. Cochran intended that Mr. Berger and the NLMGA Trust take the actions that constitute breaches of the Company's Operating Agreement, and knew that his actions were certain (given the membership interest distribution) to result in the resolution being passed and resulting harm to Mr. Jacobs.

382.   Without Mr. Cochran's actions, the resolution stripping away Mr. Jacobs's rights as a member and manager would not have passed, and Mr. Berger and the NLMGA Trust would not have breached the terms of the Operating Agreement and their contractual obligations and duties.

383.   As a direct and proximate result of Mr. Cochran's tortious interference with the Operating Agreement, Mr. Jacobs suffered and continues to suffer great damage including complete loss of his right to distributions, complete loss of his management rights, harm to his goodwill and reputation, monetary losses incurred in pursuing his legal rights in the copyrighted works, and other harms in an amount to be determined at trial.

384.   Mr. Jacobs is entitled to reasonable attorneys' fees, costs, and expenses pursuant to section 11.13 of Industry Express's Operating Agreement, Cal. Code. Civ. P. §§ 1032 and 1717, and other applicable law.

385.   Mr. Jacobs is entitled to prejudgment and post-judgment interest.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

1

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, Mr. Jacobs respectfully demands a trial by jury on all issues properly triable by a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Jacobs respectfully requests judgment in favor of Mr. Jacobs and against Industry Express and Mr. Berger on all counts herein, and an award of the following relief:

A.     Enter a declaratory judgment as stated herein;

B.     Enter a preliminary and permanent injunction enjoining and prohibiting Industry Express and its officers, directors, employees, agents, affiliates, successors, assigns, licensees, and entities owned or controlled by Industry Express, and those in privity or acting in concert with them, from reproducing, distributing, displaying, or otherwise using Mr. Jacobs's copyrighted marks or any other designs that are substantially similar thereto or derivative thereof;

C.     Order that Industry Express be required to deliver up for destruction all materials in its possession, custody or control, or the possession, custody or control of any of its employees, agents, or representatives, displaying Mr. Jacobs's marks, including without limitation all advertising and promotional materials, signs, banners, service menus, online materials, and any other materials;

D.     Order Industry Express to file with the Court and serve on Mr. Jacobs's counsel within 30 days after issuance of the injunction, a written report, sworn under oath, setting forth in detail the manner and form in which Industry Express has complied with the injunction;

E.     Order that Industry Express pay Mr. Jacobs his actual damages, plus the amount of Industry Express's profits attributable to the conduct alleged herein pursuant to 17 U.S.C. § 504(b);

F.     Order that, in the alternative to Mr. Jacobs's actual damages and Industry Express's profits, Industry Express pays Mr. Jacobs statutory damages for willful

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

703692964

copyright infringement in the amount of $150,000 per copyrighted mark, as authorized by 17 U.S.C. § 504(c);

G.      Order that Industry Express pays Mr. Jacobs, as the prevailing party, reasonable attorneys' fees, costs, and expenses pursuant to 17 U.S.C. § 505;

H.      Order that Mr. Berger, the NLMGA Trust, and Mr. Cochran pay Mr. Jacobs his actual damages for all losses he has incurred as a result of their (1) contributory copyright infringement; (2) breaches of fiduciary duties; (3) breaches of contract; (4) breaches of the implied covenant of good faith and fair dealing; (5) civil conspiracy; (6) aiding and abetting; and (7) tortious interference, to the extent allowed by law and in an amount to be determined at trial.

I.      Order that Mr. Berger and Mr. Cochran pay Mr. Jacobs, as the prevailing party, reasonable attorneys' fees, costs, and expenses pursuant to section 11.13 Industry Express's Operating Agreement, Cal. Code. Civ. P. §§ 1032 and 1717, and other applicable law.

J.      Order that Industry Express, Mr. Berger, the NLMGA Trust, and Mr. Cochran pay Mr. Jacobs prejudgment and post-judgment interest on Mr. Jacobs's damages at the applicable rate;

K.      Grant such other and further relief as is just and proper.

RESPECTFULLY SUBMITTED this 18th day of November, 2024.

**GREENBERG TRAURIG LLP**


By:/s/ Louis D. Lopez
　　Louis D. Lopez
　　Zachary H. Levy
　　*Attorneys for Plaintiff*

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

703692964

1

## VERIFICATION

I, Jeffrey Jacobs, am the Plaintiff in this lawsuit. I have read the foregoing Verified Complaint submitted in this matter. To my best knowledge and belief and based on reasonable inquiry, I believe that all of the allegations contained therein are true to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 11/18/24

_____
Jeffrey Jacobs

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

46

703692964